UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

JON A. SPETZER,             :
                               :
        Petitioner        : No. 4:CV-10-0284
                               :
    v.                      : (Judge Nealon)
                               :
FRANKLIN J. TENNIS,      :
                               :
       Respondent     :

FILED
SCRANTON

MAY 2 2 2012

PER _____
DEPUTY CLERK

**MEMORANDUM**

Petitioner, John A. Spetzer, filed the instant petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. He attacks a conviction imposed by the Court of Common Pleas for Centre County, Pennsylvania. (Doc. 1). For the reasons that follow, the Court will deny the petition.

## I.    Background

The following background has been extracted from the Pennsylvania Supreme Court's December 31, 2002 Opinion, reversing and vacating the Pennsylvania Superior Court's decision to grant a new trial. (Doc. 14, App. L, Opinion dated December 31, 2002).

> Appellee's wife, Kim, who had been married to appellee for four years by the time of trial, described their marriage as "sadistic and very violent," as she endured repeated sexual, physical and mental abuse at the hand of her husband. Throughout the course of their marriage, appellee would order Kim to "step into [his] office," at which point appellee would take her into the bedroom of their home and physically assault her.

> In January 1995, Kim's four daughters from a previous marriage, including twelve-year old B.G., traveled from Kentucky where they lived with their biological father, to Pennsylvania, intending to stay with the Spetzers until May. The Spetzers lived in a two-bedroom mobile home with their own two small children, leaving little space for the four older girls, who slept in sleeping bags on the Spetzers' living room floor. On a Saturday evening in April, B.G. awoke on the living room floor to find appellee fondling her breasts and vagina. Although B.G. repeatedly asked appellee to stop, appellee persisted despite her protests.

Within a few days of the fondling incident, appellee told B.G. to sleep in her younger stepbrother's room on the pretext that she could assist the child in the event of a fire in the mobile home. At around the same time, Kim, who normally went to bed between the hours of 10:00 p.m. and midnight, began falling asleep between 7:00 p.m. and 8:00 p.m. She later learned that appellee had been surreptitiously drugging her with chemicals that made her drowsy. Appellee, who also normally retired between 10 p.m. and 11 p.m., began going to bed between 2:30 and 3:00 a.m. In the same period of time, appellee told Kim that he did not want her daughters to wear bras and underwear to bed, claiming that the bras would cut off their circulation and the girls' underwear was creating too much laundry.

A few days after B.G. began sleeping in her stepbrother's bedroom, appellee entered the room while B.G. was sleeping and raped B.G. at knifepoint. B.G. could not scream during the attack because appellee forced a folded tube sock into her mouth, which caused the sides of her mouth to split and bleed. After the rape, appellee threatened to kill B.G. or ruin her life if she said anything to anyone. Appellee again sexually assaulted B.G. on each of the two following nights. Prior to the second rape, appellee put on a condom and applied vaseline, telling B.G., "it would slide easier." Again, he forced a sock into B.G.'s mouth, but this time he secured it with duct tape. On the third evening, appellee had unprotected, forced sexual intercourse with B.G. During each rape, appellee held a knife and threatened to kill B.G. if she told anyone.

In May 1995, Kim, who was unaware of the rapes, drove her four daughters, her two small children by appellee, her sister and her niece to Kentucky. Kim intended to return her four daughters to their father and then return to Pennsylvania, at which time she and appellee would move to Florida. En route to Kentucky, B.G. told her cousin that appellee had raped her. The cousin informed her mother, Kim's sister, who in turn told Kim. B.G.'s father also learned of the rapes from a family member and he immediately reported the rapes to the appropriate Kentucky child protection authorities.

Kim confronted appellee about the rapes over the telephone, at which time appellee became angry and told Kim that she "better make sure that kid keeps her mouth shut." You better tell your sister to mind her own business and you better get your ass back up here." Kim did not return to Pennsylvania. A few weeks later, however, appellee traveled by bus to Kentucky, retrieved Kim and their two children, and drove them back to Pennsylvania. During the trip to Pennsylvania, Kim told appellee that B.G. and her father had reported the rapes to authorities in Kentucky. She also told him that she was "sick to [her] stomach," "disgusted," and "didn't think [she] ever wanted him to touch [her] again." Appellee became enraged, grabbed Kim by the back of the head, pulled her head down and forced her

to perform oral sex, all while driving the car with the couple's two children awake in the back seat. He then stated: "I think you will do what I want you to from now on."

They continued to argue about the rapes during the rest of the trip back to Pennsylvania. At one point, lat at night near Cumberland Maryland, appellee became upset and pulled the car into an empty parking lot. There, he assaulted Kim and choked her while telling her to make sure B.G. "kept her mouth shut," and that "when I tell you to do something, you're going to do it."

Once back at home in Pennsylvania, Kim and appellee again discussed the rapes of B.G. and the fact that Kim's family was angry with her for not reporting the rapes in Pennsylvania. Again, appellee became very angry and began screaming at Kim, who was two and one half months pregnant at the time. Appellee kicked her, pushed her against a wall and punched her arms, causing bruising. Kim managed to flee from the home and rand down the street screaming that appellee was going to kill her. She went to the home of a neighbor whom she had never met and called the police. The police responded and arrested appellee, who as then admitted to Meadows Psychiatric Hospital.

Following appellee's arrest, Kim petitioned for a Protection From Abuse (PFA) order. When she returned home, however, she found a note from appellee's father stating that he wanted the car, which he owned, returned to him or he would have Kim arrested for stealing it. The note also informed Kim that she had two weeks to vacate her mobile home, which appellee's parents also owned. Kim testified that she had no money, job, car or place to live on her own, and that she was completely dependent upon appellee and his parents. Therefore, she agreed to withdraw the PFA petition. In response, appellee's parents returned the car to Kim and allowed her to remain in the mobile home.

In an effort to learn more about what appellee had done to B.G., and to determine whether he had abused any of her other children, Kim spoke several times on the telephone to appellee and visited him once while he was at Meadows Psychiatric Hospital. During the visit, appellee told his wife that he did not rape B.G.; instead, he said, "it really wasn't sex because I didn't get it all the way in." He also admitted that he kept B.G. quiet during the attack by stuffing a sock in her mouth and securing it with duct tape and that he "really had her scared with a knife." Appellee told Kim that B.G. was "so terrified of me after a while she just let me do it." Kim testified that, as appellee was relating this fact to her, he "was laughing about it like it was fun to him, funny to him that he had terrified her so much that she would do what he wanted her to do without having to terrorize her any more to do it." Appellee admitted to having raped B.G. five times, and to threatening B.G. that if she ever told anyone of the assaults he would kill her.

In July of 1995, B.G.'s father brought her three sisters and B.G. to Pennsylvania to report the rapes. Both B.G. and Kim made statements to the police about the rapes, B.G. stating what had occurred and Kim reporting that appellee had admitted to her that he had sex with the twelve-year old B.G., although appellee deemed it to be consensual. Appellee, who had been released from the hospital by that time, became enraged that B.G. and her father had reported the rapes and that Kim was unable to convince them to return to Kentucky and he again assaulted Kim. He threatened to kill B.G. and her father by shooting the tires of their car as they were driving or to follow them to Kentucky and shoot B.G. with his compound bow and arrow as she returned home from school.

On July 14, 1995, appellee was charged with rape, statutory rape and related crimes as a result of his assaults upon B.G., and bail was set at $25,000. While appellee was in jail and after he was released on bail, he continued to engage in a course of conduct designed to intimidate Kim and B.G. into recanting their accusations. During one jail visit, appellee told Kim to tell his lawyer that she had lied to police about the rapes and to have B.G. write a letter to the District Attorney's Office stating that she had also lied. Appellee suggested that B.G. write that she had seen a magazine or a newspaper article about rape and that the article gave B.G. the idea to falsely accuse appellee. Kim eventually agreed to appellee's demands because she was fearful that appellee would soon be released from jail since his parents had the financial resources to post bail. Accordingly, she told appellee's lawyer that she had lied to the police. Kim also telephoned B.G. and told her that appellee wanted her to writ a letter to the District Attorney's Office indicating that she had fabricated the rapes. B.G. refused. Appellee wrote several letters to Kim urging her to have B.G. write the recantation letter. Appellee also asked that B.G. write letters to him saying that she was sorry, that he was a good stepfather, and that he would never have raped her.

By the time of his arraignment, appellee had been released on bail and had been ordered to stay away from Kim and her daughters. Outside the arraignment courtroom, however, Kim told appellee that she would not lie for him in court and threatened to tell the District Attorney that he was pressuring him to lie.

In violation of the court's protective order, appellee returned to the mobile home that very night, kicked in the door, and forced Kim, who was seven months pregnant at that time, to remove her clothes and get down on her hand and knees. Appellee then kicked Kim and beat her with his belt, while screaming at the top of his lungs: "what are you going to do, Kim? You're going to tell the D.A. what? I don't think so, Kim. ...I don't think you're going to tell the D.A. anything. I think you're going to stick with the story lying to my lawyer." Kim testified at trial that even though she knew she could potentially be jailed for lying to the police and the District Attorney, she would rather be charged with perjury and go to jail than

4

endure further beating by appellee. Therefore, she agreed to abide by her recantation to appellee's lawyer about appellee raping B.G.

After securing through violence his wife's promise to lie on his behalf about the rape of her daughter, appellee escalated the pressure on Kim to convince B.G. to recant her accusations. Appellee himself wrote letters to B.G. which he directed Kim to transmit to the child for him, since appellee had been ordered to have not contact with B.G. Appellee told Kim to remind B.G. of the threats that he had made to B.G. after raping her and that he would kill her or ruin her life if she reported the assaults. B.G. testified that, when her mother related to her what appellee had said, she felt "scared...that he might come after me," and that appellee "would hunt me down and try to kill me." B.G. ultimately succumbed to the pressure from her mother and appellee, and wrote a letter to the District Attorney, which she provided to her mother, stating that she had lied about the rapes.

Appellee, apparently not satisfied with his successful efforts to secure recantations from Kim and B.G., attempted to enlist Kim to arrange a further sexual encounter in a motel with both B.G. and B.G.'s thirteen-year-old sister. At the time, both appellee and Kim were prohibited by court order from contacting Kim's daughters. Appellee asked Kim to meet the children, who were in foster care at the time, at an area mall and take them to a pre-arranged motel room where appellee would sexually assault both girls while Him waited in the mall. Appellee, who was not living with Kim at the time, was "obsessed" with the ides of sexually assaulting the two girls, and pressured Kim on a daily basis to arrange the meeting. When, during a telephone conversation, Kim indicated reluctance to arrange the meeting, appellee ended the telephone conversation and went to the trailer where Kim was still living, tied her to the bed, beat her with a stick and threatened to sodomize her.

This latest assault led Kim to agree that she would arrange a sexual encounter with her daughters and on three separate occasions appellee forced Kim to accompany him to a mall in Altoona for that purpose. The first time, Kim's daughters were at the mall but Kim did not bring them to appellee's motel room, which resulted in appellee beating Kim. The other two times, the girls were not at the mall because Kim had never actually arranged to meet them there. After the third failed attempt, appellee beat and sodomized Kim for failing to deliver her daughters as arranged, stating that, "next time I'm going to get the girls to the hotel. ...[Y]ou're going to start doing what I tell you to do. The next time you better get them."

At this point, it became apparent to Kim that appellee was steadfast in his intent to sexually assault her daughters, so she reported his plans to the Pennsylvania State Police. Kim consented to a wiretap interception of her telephone conversations with appellee because, she testified, if she did not do so, appellee "would have eventually one day picked up the kids himself and brought them to the hotel room." The

5

recorded conversations detailed, among other things, appellee's previous rapes of B.G., his continuing attempts to intimidate Kim and B.G. into not testifying truthfully, and his continuing intention to arrange for the sexual assault of B.G. and her sister.

In the intercepted telephone conversations, appellee discussed the particulars of his planned sexual assault. Among other things, appellee discussed whether he intended to use a condom; asked Kim to ask the children if they became sexually aroused at the prospect of having sex with him; and requested that Kim bring two packages of "edible underwear" with her on the day of the would-be-rendezvous, so that each child could wear one. Appellee also acknowledged the plan for Kim to abduct the girls at the mall and leave them with him in a nearby motel where, he said, he intended to "eat, suck and f–k" the victims. Appellee went on to discuss which of is stepdaughters he intended to "do" first, admitting in the process to his previous rapes of B.G. Appellee stated that he had decided that he would rape B.G.'s older sister first, since B.G. had "already had her taste." Also, in these conversations, appellee made continuing attempts to influence Kim and B.G. to lie to authorities about the prior rapes. Finally, appellee asked Kim several times over the course of the recorded conversations if she was taping them; she responded that she was not.

On the day of the would-be rendezvous, Kim picked appellee up and drove to a motel where she secured a room in her name. Appellee took the key to the room and Kim left the motel. The State Police then entered the motel room and placed appellee under arrest. The troopers retrieved several items from the room, including gray duct tape, two boxes of edible underwear, a box of condoms, and a jar of vaseline. Appellee was charged with numerous counts of intimidating witnesses, criminal solicitation and criminal attempt.

The pending rape charges were consolidated with this second set of charges for trial. In July of 1996, a jury convicted appellee of all charges, encompassing some fifty-eight total counts. Appellee filed post-trial motions, which the trial court denied. Appellee was then sentenced to an aggregate term of sixty-three to one hundred and twenty-six years of imprisonment.

Id. Spetzer filed a direct appeal to the Pennsylvania Superior Court, raising the following six

issues for review:

1.    Whether trial counsel was ineffective for, inter alia, failing to object to the admission of confidential communications between appellant and his wife, hearsay testimony, and other irrelevant or inadmissible testimony.

2.    Whether the court erred in failing to suppress the contents of
       intercepted telephone conversations because admission of them
       violated the confidentiality privilege.

3.    Did the sentencing court abuse its discretion in sentencing appellant?

4.    Did the District Attorney commit prosecutorial misconduct in not
       turning over a potentially exculpatory letter to appellant's counsel?

5.    Did the court err in denying appellant's motion to sever?

6.    Was the evidence sufficient to sustain the conviction as to all attempt
       and solicitation charges?

Id. (Doc. 14-11, App. J, Memorandum Opinion dated December 17, 1998).

By Memorandum Opinion dated December 17, 1998, the Pennsylvania Superior Court

vacated the judgment of sentence and granted a new trial based on a violation of Pennsylvania's

spousal privilege during the trial. Id. The Superior Court also reversed twenty (20) convictions of

attempt and solicitation crimes. Id. The Commonwealth sought review in the Pennsylvania

Supreme Court, which was granted. See (Doc. 14, App. L, Opinion dated December 31, 2002).

The issue raised on appeal was whether the Superior Court erred in granting a new trial on grounds

that trial counsel was ineffective for failing to object, under the spousal confidential

communications privilege set forth in 42 Pa.C.S. § 5914, to the voluntary testimony of appellee's

wife relating statements appellee made to her while charges were pending against him for the rape

of his twelve year-old stepdaughter, B.G. Id.

In an Opinion dated December 31, 2002, the Pennsylvania Supreme Court held that

communications between Appellant and his wife were not protected by spousal privilege and that

trial counsel was not ineffective for failing to object to the admission of this evidence. Id. Thus,

the Pennsylvania Supreme Court reversed the Superior Court's decision on the spousal privilege

issue and remanded for the limited purpose of determining whether Spetzer should receive a new trial as a result of trial counsel's failure to object to hearsay testimony at trial. Id.

On remand, the Pennsylvania Superior Court found no discernible prejudice and denied Spetzer's request for a new trial. (Doc. 14-15, App. N, Memorandum Opinion dated May 26, 2004). The Superior Court then remanded for resentencing with regard to the convictions reversed by their December 21, 1998 Opinion. Id.

On remand, the Court of Common Pleas resentenced Spetzer on July 12, 2004, to an aggregate term of 53 to 106 years of imprisonment. (Doc. 1, petition at p. 3A). Petitioner filed a direct appeal to the Pennsylvania Superior Court, raising two challenges to his resentencing: whether the trial court set forth adequate reasons for its sentence and whether the trial court abused its discretion by sentencing Appellant outside the sentencing guidelines. (Doc. 14-16, App. O, Brief for Appellant).

By Memorandum Opinion dated August 8, 2005, the Pennsylvania Superior Court affirmed the judgment of sentence. (Doc. 14-17, App. P, Memorandum Opinion dated Aug. 8, 2005).

On June 21, 2006, Petitioner filed a pro se petition for relief under Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. Ann. §§ 9541 et seq. (Doc. 14-18, App. Q, PCRA Petition). On July 6, 2006, counsel was appointed, and after reviewing Petitioner's claims, filed a motion to withdraw and a "No Merit" brief on April 10, 2008. See (Doc. 14-19, App. R, Motion to Withdraw).

On October 17, 2008, the motion to withdraw was granted and the Court of Common Pleas denied the PCRA petition. (Doc. 14-20, App. S, Opinion).

Petitioner filed a timely appeal in which he raised the following issue for review:

8

Did the trial court err by dismissing appellant's post-conviction collateral relief petition on the basis that PCRA counsel did not fail to raise an issue of arguable merit.

(Doc. 14-21, App. T, Memorandum Opinion dated Sept. 16, 2009).

In an opinion dated September 16, 2009, the Pennsylvania Superior Court affirmed the PCRA Court's dismissal of Petitioner's PCRA petition. Id.

On February 8, 2010, Petitioner filed the instant petition for writ of habeas corpus in which he raises the following claims for relief:

1.      State Court decision regarding spousal privilege was contrary to clearly established United States Supreme Court precedent.

2.      Trial counsel was ineffective for failing to:
   a.      object to hearsay and testimony about pre-arrest silence;
   b.      object to improper remarks by prosecutor;
   c.      present medical expert testimony.

3.      Commonwealth's failure to disclose evidence favorable to the defendant.

4.      Conviction obtained by use of false or perjured testimony.

(Doc. 1, Petition).

In accordance with United States v. Miller, 197 F.3d 644 (3d Cir. 1999), and Mason v. Meyers, 208 F.3d 414 (3d Cir. 2000), the Court issued formal notice to Spetzer that he could either have the petition ruled on as filed, that is, as a § 2254 petition for writ of habeas corpus and heard as such, but lose his ability to file a second or successive petition, absent certification by the court of appeal, or withdraw his petition and file one all-inclusive § 2254 petition within the one-year statutory period prescribed by the Antiterrorism Effective Death Penalty Act ("AEDPA"). (Doc. 4). Upon Spetzer's return of the notice of election form, indicating that he wished to proceed on

the petition for writ of habeas corpus as filed, the Court issued a Show Cause Order. (Doc. 7). A response to the petition, and supporting memorandum, have been filed. (Docs. 14, 16). However, although provided the opportunity to file a traverse, no traverse was filed.

## II.    **Standards of Review**

A habeas corpus petition pursuant to 28 U.S.C. § 2254 is the proper mechanism for a prisoner to challenge the "fact or duration" of his confinement. Preiser v. Rodriguez, 411 U.S. 475, 498-499 (1973). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67-8 (1991). Rather, federal habeas review is restricted to claims based "on the ground that [petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); Estelle, 502 U.S. at 67-8 (1991); see also Pulley v. Harris, 465 U.S. 37, 41 (1984); Johnson v. Rosemeyer, 117 F.3d 104 (3d Cir. 1997).

### A.    **Exhaustion**

"A federal court may not grant a writ of habeas corpus unless (1) 'the applicant has exhausted the remedies available in the courts of the state', (2) no such state remedy is available or (3) available remedies are ineffective to protect the applicant's rights. 28 U.S.C. § 2254(b)(1)." Henderson v. Frank, 155 F.3d 159, 164 (3d Cir. 1998). "The exhaustion requirement is satisfied when the state courts have had an opportunity to pass upon and correct alleged constitutional violations." Evans v. Court of Common Pleas, Delaware County, Pa., 959 F.2d 1227, 1230 (3d Cir. 1992). The exhaustion requirement "is not a mere formality. It serves the interests of comity between the federal and state systems by allowing the state an initial opportunity to determine and correct any violations of a federal prisoner's federal rights." Gibson v. Scheidemantel, 805 F.2d

135, 138 (3d Cir. 1986). "Unless it would be patently futile to do so [state prisoners] must seek relief in state court before filing a federal habeas petition...." Santana v. Fenton, 685 F.2d 71, 77 (3d Cir. 1982).

The habeas corpus petitioner shoulders the burden of establishing exhaustion of state court remedies. McMahon v. Fulcomer, 821 F.2d 934, 940 (3d Cir. 1987). The threshold inquiry in the exhaustion analysis is whether the claims asserted in the habeas corpus petition have been "fairly presented" to the state courts. Picard v. Connor, 404 U.S. 270, 275 (1971). "All claims that a petitioner in state custody attempts to present to a federal court for habeas review must have been fairly presented to each level of the state courts." Lines v. Larkins, 208 F.3d 153, 159 (3d Cir. 2000), cert. denied, 531 U.S. 1082 (2001). Fair presentation requires that the "substantial equivalent" of a petitioner's federal habeas claims be presented to the state courts. Lambert v. Blackwell, 134 F.3d 506, 513 (3d Cir. 1997).

**B. Merits**

"The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002). Specifically, when a federal-law issue has been adjudicated on the merits by a state court, the federal court reverses only when the decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court, or was based on an unreasonable determination of

the facts in light of the evidence. 28 U.S.C. § 2254(d).[1]  See generally, Knowles v. Mirzayance,

556 U.S. 111, 120-22 (2009); Gattis v. Snyder, 278 F.3d 222, 234 (3d Cir. 2002); Moore v.

Morton, 255 F.3d 95, 104-05 (3d Cir. 2001). The Supreme Court has held that the "contrary to"

and "unreasonable application" clauses of § 2254(d)(1) have independent meaning.  Williams v.

Taylor, 529 U.S. 362, 404-05 (2000).  As explained in Bell:

> A federal habeas court may issue the writ under the "contrary to" clause if the state
> court applies a rule different from the governing law set forth in our cases, or if it
> decides a case differently than we have done on a set of materially indistinguishable
> facts.  The court may grant relief under the "unreasonable application" clause if the
> state court correctly identifies the governing legal principle from our decisions but
> unreasonably applies it to the facts of the particular case.  The focus of the latter
> inquiry is on whether the state court's application of clearly established federal law
> is objectively unreasonable ....

Bell, 535 U.S. at 694 (citations omitted).

In a recently announced decision, Renico v. Lett, --- U.S. ----, 130 S.Ct. 1855, 176 L. Ed.

2d 678 (2010), the United States Supreme Court, quoting Williams, explained that "an

unreasonable application of federal law is different from an incorrect application of federal law."

---

[1]Specifically, 28 U.S.C. § 2254(d) provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant
to the judgment of a State court shall not be granted with respect to any claim that was
adjudicated on the merits in State court proceedings unless the adjudication of the
claim-

(1) resulted in a decision that was contrary to, or involved an unreasonable application
of, clearly established Federal law, as determined by the Supreme Court of the United
States; or

(2) resulted in a decision that was based on an unreasonable determination of the
facts in light of the evidence presented in the State court proceeding.

Id. at 1862. Therefore, a federal court may not grant habeas relief simply because it has concluded in its independent judgment that the state court decision applied clearly established federal law erroneously or incorrectly.[2] Id. Rather, the state court application must be objectively unreasonable. Renico added that this distinction creates a substantially higher threshold for obtaining relief under § 2254 and imposes a highly deferential standard for evaluating state court decisions. Simply put, "state-court decisions [must] be given the benefit of the doubt." Id. (quoting Woodford v. Viscotti, 537 U.S. 19, 24 (2002) (per curiam)).

This deferential standard of review applies to state court decisions on ineffective assistance of counsel claims. Bell, 535 U.S. at 694-98. Furthermore, resolution of factual issues by the state courts are presumed to be correct unless the petitioner shows by clear and convincing evidence that they are not. 28 U.S.C. § 2254(e)(1).

## III.   Discussion

### A.   Spousal Privilege

In his federal habeas petition, Spetzer frames this issue as follows:

> On direct appeal to the Pennsylvania Superior Court the issue of confidential communications was raised. Whereas neither husband nor wife shall be competent or permitted to testify to confidential communications made by one to the other. Based on prior rulings by the Superior Court, the Court had determined the wife was not competent or permitted to testify to confidential communications and had issued an order granting petition a new trial.

> The Commonwealth appealed this decision to the Pennsylvania Supreme Court. After nearly three (3) years, the Court returned a decision. Overturning the new trial, which was correctly granted by the Superior

---

[2]"Whether the trial judge was right or wrong is not the pertinent question under the AEDPA." Id. at 1865 n.3; 671 A.2d 773.

Court, on the basis of an 1895 civil divorce case.  This decision is contrary to precedent as set forth by the United States precedent as set forth by the United States Supreme Court in both the <u>Blau</u> and <u>Trammel</u> court.

(Doc. 1, petition at 6A).

The Pennsylvania Supreme Court addressed the issue in the following manner:

Appellee appealed to the Superior Court, raising several claims.  Pertinent to this appeal, appellee claimed that his trial counsel was ineffective for failing to object to the admission of Kim Spetzer's testimony regarding communications between the two concerning the previous rapes and the attempts to arrange the sexual assault of B.G. and her older sister.  Appellee argued that these communications were privileged under 42 Pa. C.S. § 5914, which provides that:

> Except as otherwise provided in this subchapter, in a criminal proceeding neither husband nor wife shall be competent or permitted to testify to confidential communications made by one to the other, unless this privilege is waived upon the trial.

<u>Id</u>.  The Commonwealth argued that the communications fell outside the scope of the § 5914 privilege and that, in any event, all of the communications were admissible because the § 5914 privilege was inapplicable, in this instance involving sexual assaults upon appellee's minor stepdaughters, by operation of 23 Pa.C.S. § 6381(c).  Section 6381(c), which is part of the Child Protective Services Law (CPSL), provides that the spousal confidential communications privilege, "shall not constitute grounds for excluding any evidence at any proceeding regarding child abuse or the cause of child abuse."

The Superior Court panel noted that the § 5914 privilege and § 6381(c)of the CPSL "appear to be inconsistent" because "[i]f the communications are deemed admissible that interpretation would appear at odds with § 5914" while, "[c]onversly, if the communications are deemed inadmissible then that interpretation would appear to be at odds with ...§6381." <u>Commonwealth v. Spetzer</u>, 722 A.2d 702, 707 (Pa. Super. 1998).  After noting the obvious inconsistency in the statues, the panel rejected the Commonwealth's argument premised upon the CPSL, finding that it was

inapplicable to criminal proceedings.[3] The panel then determined that, while certain of the communications between appellee and his wife were not covered by the § 5914 privilege, others were. The panel further concluded that trial counsel lacked a reasonable basis for failing to object to those communications which were privileged, noting that counsel had testified on post-verdict motions and stated that the only reason he failed to object was because he believed the testimony was admissible under 42 Pa.C.S. § 5913. The panel further found that the prejudice arising from counsel's ineffectiveness was "obvious", since the Commonwealth itself had noted that Kim Spetzer's testimony "might be the only evidence available to prove some of the crimes charged." Id. at 711-13. Accordingly, the panel awarded appellee a new trial on the basis of this claim. Id. at 717.

In granting a new trial, the panel did not pass upon the admissibility of each of the challenged statements. Instead, the panel articulated for the trial court upon remand a frame of analysis of "various general categories of communications presented in this appeal," which the trial court was to employ in determining which communications should be deemed admissible at retrial. The panel deemed generally admissible: (1) appellee's direct threats to injure or kill his wife, as well as information conveyed as part of the direct threats, since such are repugnant to the intimacy and confidentiality that is the basis of the marital privilege; and (2) appellee's direct threats to injure or kill his stepdaughters, for similar reasons. On the other hand, the panel deemed generally inadmissible: (1)

---

[3]The panel found support for this conclusion in this Court's decision in Commonwealth v. Hancharik, 633 A.2d 1074 (Pa. 1993), a case in which the defendant was accused of sexually assaulting a friend's child. In Hancharik, this Court held that the defendant's claim that his counsel should have objected to his wife's testimony concerning confidential marital communications had arguable merit, but that counsel was not ineffective because the defendant failed to demonstrate that counsel lacked a reasonable basis for failing to object. 633 A.2d at 1079-80. The panel found it significant that the Hancharik Court did not *sua sponte* invoke § 6381 of the CPSL as abrogating the privilege set forth in § 5914 and interpreted that silence as providing "some additional weight" to appellee's argument that the § 5914 privilege is unaffected by the CPSL. Spetzer, 722 A.2d 706-09. Since the potential effect of § 6381 of the CPSL on the § 5914 privilege is not at issue in Hancharik and was never even discussed by this Court, the case does not support the Superior Court panel's conclusion concerning the CPSL.

appellee's "inculpatory statements or confessions" unless they had a character "affronting" his wife; and (2) appellee's attempts to solicit his wife to arrange for the sexual assault of her daughters, as well as communications revealing his attempts to intimidate and influence witnesses, except to the extent that they were accompanied by actual physical threats.  The panel reasoned that statements falling under the latter exclusionary "categories" "bear the hallmarks" of an intimate sharing made within the confidentiality of the marital relationship.  Id.  at 711-13.

* * *

Judge Kelly filed a concurring opinion, which was joined by Senior Justice Montemuro (who had also joined the majority opinion).  The concurrence addressed only the claim involving the spousal confidential communications privilege.  Judge Kelly noted his agreement with the majority's analysis, but expressed his "distaste for the spousal privilege as it applies to situations involving the sexual abuse of a child."  722 A.2d at 717-18 (Kelly, J., concurring).  Judge Kelly stated that, "[i]n my opinion, no parent should be expected to remain silent concerning sexual abuse inflicted upon his or her children especially when the abuse is at the hands of a co-parent.  Pennsylvania law, however, hold otherwise."  Id.  at 718.

The Commonwealth filed for reargument, which was denied, and then sought review in this Court, limited to the question of the admissibility of the communications between appellee and his wife.  This Court granted review to examine the scope of the spousal confidential communications privilege set forth in § 5914 of the Judicial Code, as well as the interplay of § 5914 and § 6381 of the CPSL.

(Doc.  14-13, App.  L, Supreme Court Opinion at 9-12).  The Pennsylvania Supreme Court

reversed the Superior Court, ruling that Petitioner's statements were not "confidential

communications" within the meaning of § 5914 because they were not intended to further the

historic, common law purposes of the privilege.  Commonwealth v.  Spetzer, 472 Pa.  17, 40, 813

A.2d 707, 721 (Pa.  2002).

As is apparent from the Pennsylvania Supreme Court's decision, Petitioner's challenge to

the spousal privilege was raised and addressed within the confines of the Court's construction of §

5914. To prevail in his federal habeas corpus petition, however, Spetzer must show that he is "in

custody in violation of the Constitution or laws or treaties of the United States," as opposed to a

violation of state laws. 28 U.S.C. § 2254(a). Under § 2254, "a federal court may not issue the writ

on the basis of a perceived error of state law." Pulley v. Harris, 465 U.S. 37, 41 (1984). Claims

asserting a violation of a state law, or challenging a state court's interpretation of state law, are not

cognizable on federal habeas review. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("We have

stated many times that 'federal habeas corpus relief does not lie for errors of state law.' ")

Geschwendt v. Ryan, 967 F.2d 877, 888-89 (3d Cir. 1992) ("[I]t is well established that a state

court's misapplication of its own law does not generally raise a constitutional claim. The federal

courts have no supervisory authority over state judicial proceedings and may intervene only to

correct wrongs of constitutional dimension."); see also Johnson v. Rosemeyer, 117 F.3d 104, 109

(3d Cir. 1997) (same); Riley v. Harris, 277 F.3d 261, 310 n.8 (3d Cir. 2001) (concluding that

federal habeas relief is not available for an error of state law).

Moreover, to the extent that Spetzer now raises a federal constitutional claim, such claim is

unexhausted. A federal court, absent unusual circumstances, should not entertain a petition for

writ of habeas corpus unless the petitioner has first satisfied the exhaustion requirement of 28

U.S.C. § 2254. Under section 2254(c), a petitioner will not be deemed to have exhausted available

state remedies if he had the right under the law of the state to raise, by any available procedure, the

question presented. For a claim to be exhausted "[b]oth the legal theory and facts underpinning the

federal claim must have been presented to the state courts." Evans, 959 F.2d at 1231. The habeas

corpus petitioner has the burden of proving exhaustion of all available state remedies. Lambert,

17

134 F.3d at 513.

To satisfy the exhaustion requirement, petitioners "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process" before being presented to the federal courts. O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999). Spetzer failed to present this claim to any state appellate court. Consequently, it is not considered exhausted for the purpose of habeas review unless Spetzer's failure to exhaust his state court remedies is excused.

"When a claim is not exhausted because it has not been 'fairly presented' to the state courts, but state procedural rules bar the applicant from seeking further relief in state courts, the exhaustion requirement is satisfied because there is 'an absence of available State corrective process.' 28 U.S.C. §2254(b). In such cases, however, applicants are considered to have procedurally defaulted their claims and federal courts may not consider the merits of such claims unless the applicant establishes 'cause and prejudice' or a 'fundamental miscarriage of justice' to excuse his or her default. See Coleman v. Thompson, 501 U.S. 722, 750 (1991)." McCandless v. Vaughn, 172 F.3d 255, 260 (3d Cir. 1999); see also, Wenger v. Frank, 266 F.3d 218, 224 (3d Cir. 2001); Keller v. Larkins, 251 F.3d 408, 415 (3d Cir.) cert. denied, 122 S.Ct. 396 (2001); Lines, 208 F.3d at 164-66.

To show cause, a petitioner must demonstrate some objective factor external to the defense that prevented compliance with the state's procedural requirements. Murray v. Carrier, 477 U.S. 478, 488 (1986); Caswell v. Ryan, 953 F.2d 853, 862 (3d Cir.) cert. denied, 504 U.S. 944 (1992). "Prejudice" will be satisfied if the habeas petitioner shows that the outcome was "unreliable or fundamentally unfair" as a result of a violation of federal law. See Lockhart v. Fretwell, 506 U.S.

18

364, 366 (1993); <u>Coleman</u>, 501 U.S. at 750.  In order to demonstrate a fundamental miscarriage of justice, a petitioner must show that he is actually innocent of the crime by presenting new evidence of innocence.  <u>Schlup v. Delo</u>, 513 U.S. 298 (1995); <u>Keller</u>, 251 F.3d 408.

In view of the passage of time since his conviction became final, it does not appear that there remain any state court remedies that Spetzer can now pursue.  <u>See Lines</u>, 208 F.3d at 163. That is, any relief that may have been available to Spetzer under the PCRA act is now foreclosed by its 1-year statute of limitations and Petitioner's claims do not satisfy any of the three §9545 exceptions.  <u>See</u> 42 Pa.C.S.A. § 9545.[4]  The Petitioner, however, has not alleged cause or

---

[4]Pennsylvania prisoners must file their initial and subsequent PCRA petitions:

> within one year of the date the judgment becomes final, unless the petition alleges and the petitioner proves that:
>
> (i)    the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;
>
> (ii)   the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or
>
> (iii)  The right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time provided in this section has been held by that court to apply retroactively.

(2)    Any petition invoking an exception provided in paragraph (1) shall e filed within 60 days from the date the claim could have been presented.
42 Pa.C.S. § 9545(b).

prejudice.  Nor has he demonstrated his actual innocence such that a lack of review by the court

will constitute a fundamental miscarriage of justice.   Accordingly, his challenge to the spousal

privilege must be rejected on the ground that Spetzer failed to pursue the issue in the state courts

and has not established appropriate grounds for this Court to consider the claims in the first

instance.  Consequently, the petition for writ of habeas corpus will be denied as to his claim.

### B.    Ineffective Assistance of Counsel

In Strickland v. Washington, 466 U.S. 668, 688 (1984), the United States Supreme Court

held that to prove a constitutional violation for ineffective assistance of counsel, a habeas petitioner

must meet a two-pronged test.  The petitioner must show "that counsel's performance was

deficient" and that "the deficient performance prejudiced the defense."  Id. at 687; accord Deputy

v. Taylor, 19 F.3d 1485, 1493 (3d Cir. 1994).

To demonstrate deficient performance, a petitioner must show that "counsel's performance

fell below an objective standard of reasonableness."  Strickland, 466 U.S. at 688; accord Jermyn v.

Horn, 266 F.3d 257, 282 (3d Cir. 2001).  A reviewing court must "indulge a strong presumption

that counsel's conduct falls within the wide range of reasonable professional assistance."

Strickland, 466 U.S. at 689; accord Jermyn, 266 F.3d at 282; Berryman v. Morton, 100 F.3d 1089,

1094 (3d Cir. 1996).  If, under the circumstances, counsel's actions might be considered sound trial

strategy, the presumption is not rebutted, Strickland, 466 U.S. at 689, because "substantial

deference is to be accorded counsel's tactical decisions."  United States v. Wiener, 127 F. Supp. 2d

645, 648 (M.D. Pa. 2001).  A decision supported by "reasonable professional judgment does not

constitute ineffective assistance of counsel.  See Burger v. Kemp, 483 U.S. 776, 794, (1987).  It

follows that counsel cannot be deemed ineffective for pursuing a meritless claim.  Hartey v.

Vaughn, 186 F.3d 367, 372 (3d Cir. 1999).

A petitioner satisfies the second prong and shows prejudice when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694; accord Frey v. Fulcomer, 974 F.2d 348, 358 (3d Cir. 1992) "Without proof of both deficient performance and prejudice to the defense ... it could not be said that the sentence or conviction resulted from a breakdown in the adversary process that rendered the result of the proceeding unreliable, and the sentence or conviction should stand." Bell v. Cone, 535 U.S. 685, 695 (2002) (internal quotations and citation omitted). In assessing whether the result of the proceeding might have been different, a reviewing court must consider the "totality of the evidence before the judge or jury." Strickland, 466 U.S. at 695; Jermyn, 266 F.3d at 283. However, "a court can choose to address the prejudice prong before the ineffectiveness prong and reject an ineffectiveness claim solely on the ground that the defendant was not prejudiced." Rolan v. Vaughn, 445 F.3d 671, 678 (3d Cir. 2006). "The object of an ineffective assistance claim is not to grade counsel's performance. If it is easier to dispose of an ineffective assistance claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Id.

When the Pennsylvania state courts reviewed the claims raised by Spetzer, Strickland's familiar two-pronged test was the "clearly established federal law" applicable to ineffective assistance of counsel claims. Under Pennsylvania state jurisprudence, a three-prong test is applied to ineffective assistance of counsel claims, but is, in substance, identical to the Strickland test. See e.g., Commonwealth v. Johnson, 565 Pa. 51, 771 A.2d 751, 757 (Pa. 2001). The Third Circuit

Court of Appeals has held that Pennsylvania's test for assessing ineffective assistance of counsel claims is not contrary to <u>Strickland</u>. <u>Jacobs v. Horn</u>, 395 F.3d 92, 107 n. 9 (3d Cir. 2005); <u>Werts v. Vaughn</u>, 228 F.3d 178, 204 (3d Cir. 2000). Thus, under § 2254(d)(1), the relevant inquiry in addressing an ineffectiveness claim that has been adjudicated on the merits is whether the Pennsylvania state court decision involved an unreasonable application of <u>Strickland</u>. <u>Jacobs</u>, 395 F.3d at 107 n. 9; <u>Werts</u>, 228 F.3d at 204.

Petitioner in this case advances no argument that the Superior Court decision is contrary to extant United States Supreme Court precedent. In this regard, Petitioner does not maintain that the ineffective assistance test applied by the state court is inconsistent with the test established in <u>Strickland</u> and developed in its progeny. Thus, each asserted instance of ineffective assistance will be considered against this standard.

### 1. Counsel's failure to object to hearsay and other irrelevant information.

Petitioner claims that trial counsel was ineffective for failing to object to the following inadmissible evidence: (a) testimony that petitioner had been kicked out of the military; (b) testimony that petitioner had sexually harassed another girl in North Dakota while in the military; and (c) testimony about petitioner receiving an Article 15 probation from the military. (Doc. 1, petition at 7A). He also claims that counsel was ineffective for failing to object to the following hearsay evidence: (a) testimony through petitioner's step-daughter, whereby she was allowed to testify that her sister, (who is not a victim in this case) stated that physical touching also happened to her; (b) testimony by petitioner's wife that she learned she was being drugged by the petitioner; (c) testimony by petitioner's wife that a security police officer in North Dakota told her that her face looked red for someone not being hit; and (d) testimony of petitioner's wife to the extent that a

22

commander on petitioner's military base stated that petitioner was a problem child and knew that he had beaten her. Id.

On direct appeal, the Pennsylvania Superior Court found that trial counsel presented no explanation for failing to object to the inadmissible hearsay, and, as such, there was ineffective assistance of counsel. (Doc. 14-11, App. J, Dec. 17, 1998 Superior Court Opinion at 29-30). On remand from the Pennsylvania Supreme Court, the Superior Court found the following:

> To prevail on an ineffectiveness claim, an appellant must show that the claim is of arguable merit; that counsel had no reasonable strategic basis for is action or inaction; and that counsel's errors and omissions prejudiced the outcome of the trial. See Commonwealth v. Hutchinson, 811 A.2d 556, 561 (Pa. 2002), cert. denied, ---- U.S. ----, 124 S.Ct. 159 (2003). A new trial is not warranted when:
>
>> (1) the error did not prejudice the defendant or the prejudice was de minimis; (2) the erroneously admitted evidence was merely cumulative of other untainted evidence with was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.
>
> Id.
>
> The statements in question were hearsay; thus, Appellant presents a meritorious claim. Nevertheless, his appeal fails in light of the overwhelming evidence of his guilt. In his brief, Appellant attacks the hearsay statements and suggests that "[i]t is certainly a reasonable argument to suggest that these errors may have contributed to the conviction." (Appellant's Brief at 8). This equivocated argument fails to satisfy Appellant's burden of proving actual prejudice. Moreover, he neglects to proffer any explanation as to how the harm generated by these statements negates the plethora of properly admitted evidence. Indeed, the few fleeting hearsay references likely had no meaningful effect on the outcome of a trial that featured tape recordings of Appellant admitting to and describing in graphic detail the crimes he had already committed and those he intended to commit. The hearsay testimony was cumulative and insignificant in comparison. Accordingly, we find no discernible prejudice and deny Appellant's request for a new trial.

(Doc. 14-15, App. N, May 26, 2004 Superior Court Opinion at 3-4).

With respect to trial counsel's failure to object to testimony by Kim Spetzer that Petitioner refused to speak to police prior to his arrest, the Superior Court found that "the prosecutor did not specifically ask a question about appellant's pre-arrest silence. . .[r]ather, Mrs. Spetzer volunteered this information without any undue prompting." (Doc. 14-11, App. J, December 17, 1998 Superior Court Opinion at 30).

As noted above, to establish prejudice, a petitioner must show that there is a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different. Strickland, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id. Furthermore, in considering whether a petitioner suffered prejudice, "the effect of counsel's inadequate performance must be evaluated in light of the totality of the evidence at trial: 'a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.' " Rolan v. Vaughn, 445 F.3d 671, 682 (3d Cir. 2006) (quoting United States v. Gray, 878 F.2d 702, 710-11 (3d Cir. 1989)).

As the Superior Court correctly concluded, Petitioner's conviction is well supported by the record. Accordingly, given the substantial amount of evidence presented at trail, this Court cannot conclude that the Superior Court's rejection of Petitioner's claim was contrary to, or an unreasonable application of Strickland. Petitioner is not entitled to relief on this claim, and, as such, his petition will be denied as to this claim.

### 2. Counsel's failure to object to improper remarks by prosecutor.

Petitioner claims that "several times during the closing argument of the Assistant District

24

Attorney, the Court, without objection by defense counsel, reminded the A.D.A. to refrain from stating his personal opinion as to matters relating to the case." (Doc. 1, petition at 7A). Petitioner states that, without objection from defense counsel, "the A.D.A. proceeded to inform the jury that the three rapes with which the petitioner was charged carried only three responsibilities and three punishments" and that the "petitioner was guilty of everything on the particular information in question, and that the jury should not thing that this is a lot of guilties, because it was only four indictments. Id.

Although raised by Petitioner on direct appeal, the Pennsylvania Superior Court, in a footnote, declined to address the issue, stating the following:

> Lastly, appellant argues that the prosecutor overreached in closing argument and that counsel should have objected. However, since appellant is already receiving a new trial there was no additional harm to appellant resulting from counsel's failure to object. Should the prosecutor attempt to similarly argue on retrial a timely objection could be lodged and the trial court will be presented an opportunity to deal directly with any offending comments.

(Doc. 14-11, App. J, December 17, 1998 Superior Court Opinion at 30).

Mindful of the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," this Court concludes, after reviewing the alleged comments at issue, and the fact that the trial court admonished the prosecutor for his remarks, that it was not objectively unreasonable for trial counsel to refrain from objecting during the closing argument of Petitioner's trial. See Strickland, 466 U.S. at 689. "[B]ecause many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements by the prosecutor, the failure to object during closing argument and opening statement is within the 'wide range' of permissible professional legal conduct, and thus does not constitute ineffective assistance of

25